## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

WILLIAM REECE, ET AL.,        )
                                  )
               Plaintiff,      )
vs.                             )        NO.  CIV-12-0457-JH
                                    )
AES CORPORATION, ET AL.,      )
                                  )
             Defendants.    )

## ORDER

Plaintiffs filed this case in state court as a putative class action against companies involved in the generation, transportation and disposal of coal combustion waste and oil and gas drilling waste fluids.  XTO Energy, Inc. removed the case to federal court pursuant to the Class Action Fairness Act, after plaintiffs amended their petition to add it and other defendants.  Several defendants filed motions to dismiss, which the court granted but with leave to amend.   Plaintiffs then filed their first amended complaint ("amended complaint") [Doc. #315] and more motions to dismiss, plus a motion to strike, were filed, which now are at issue.

When considering whether a plaintiff's claims should be dismissed under Fed.R.Civ.P. 12(b)(6), the court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the plaintiff as the nonmoving party.  Anderson v. Suiters, 499 F.3d 1228, 1232 (10th Cir. 2007).  The question is whether the amended complaint contains "enough facts to state a claim to relief that is plausible on its face."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The complaint must provide sufficient factual

allegations to "raise a right to relief above the speculative level." *Id.* at 555. Considering plaintiffs' claims under this standard, the court concludes the motions of the defendants that transported the waste materials should be granted and the remaining motions should be denied in part or altogether, assuming plaintiffs' supplement their amended complaint as directed with sufficient allegations of damages.

<u>Background</u>[1]

Plaintiffs contend defendants have polluted and contaminated the environment in which they live and work in LeFlore County, Oklahoma with coal combustion waste ("fly ash") generated by a coal fired electric generating plant (the "Shady Point Plant" or "Plant") and waste fluids generated by oil and gas drilling operations. They allege they have sustained property damage and personal injuries as the result of defendants' improper handling, transporting, storage or disposal of the contaminants.

Plaintiffs have sued five groups of defendants. The AES defendant group consists of AES Corporation ("AES") and two of its subsidiaries: AES Shady Point, Inc. and AES Shady Point, LLC ("AES Shady Point"),[2] which own and operate the Shady Point Plant.[3] A second group, the MMHF defendants, includes Making Money Having Fun, LLC ("MMHF"), the

---

[1]*The background is drawn from plaintiffs' allegations in the first amended complaint. Page references for briefs are to the CM/ECF document and page number.*

[2]*In their motion to dismiss, the AES defendants note that AES Shady Point, LLC was formerly known as AES Shady Point, Inc. Doc. #364, p. 7*

[3]*Two other AES subsidiaries were named as defendants– Coal Creek Minerals, Inc., which provides coal to the Plant, and Mountain Minerals, Inc., which hauls waste from the Plant to disposal sites.*

owner/operator of a commercial disposal pit (the "MMHF Facility" or "MMHF Pit") located on land owned by Thumbs Up Ranch, LLC "("TUR"), where the bulk of the fly ash generated at the Plant was taken,[4] and MMHF and TUR's owners, the Jacksons. Oil and gas companies with wells and drilling operations in Oklahoma and Arkansas that generated fluid waste that was disposed of at the MMHF Facility make up another defendant group ( the "oil producers"). The remaining groups consist of trucking companies that hauled coal to the Plant and then transported and disposed of fly ash from it ("fly ash truckers"),[5] or companies that transported fluid waste from oil and gas drilling operations to the MMHF Facility ("fluid waste truckers"). Plaintiffs refer to the oil producers and fluid waste truckers as the "PFW Defendants."

The Class Area is described in the amended complaint as:

[T]hat portion of LeFlore County, Oklahoma located within:
a. A three-mile radius or more of the Making Money Having Fun pit ("MMHF Dump Site") located approximately one (1) mile south of Bokoshe, Oklahoma, LeFlore County, Oklahoma and into which the Defendants, or any one of them, have transported or disposed or caused the transport or disposal of CCW/Fly Ash and/or PFW;
b. A three-mile perimeter measured from the legal boundaries of the AESSP property on which the plant is located; A three-mile radius of any open CCW/Fly Ash disposal pit within LeFlore County, including but not limited to the Milton Pit, the Rose Mine Pit, the Starlite II Mine Pit, and the Heatherly Mine Pit, the presence or precise location of which Plaintiffs identify during the course of discovery in this action;
d. One thousand (1000) yards of private, roads, streets, and driveways within LeFlore County which are or have been:

---

[4]*Plaintiffs allege that a portion of the TUR ranch property was also used as a commercial storage site for fly ash generated at the Shady Point Plant.*

[5]*A few companies are alleged to have only transported and disposed of fly ash.*

   I. used by vehicles hauling CCW/Fly Ash from the AES Shady Point coal-fired plant to the MMHF Dump Site; and
   ii. used by vehicles hauling CCW/Fly Ash from the AES Shady Point coal-fired plant to any open CCW/Fly Ash disposal pit or dump site within the Class Area described in subparagraph "b" above.

Amended complaint, ¶3.

  Plaintiffs allege that in 1990 AES completed construction of the Shady Point Plant, located in the Class Area approximately seven miles from the town of Bokoshe and the MMHF Facility.[6] The Plant is fueled by coal and limestone delivered by train or trucked in by defendants GCI Mining, Mountain Minerals, Inc., Brazil Creek Minerals, Inc., Farrell-Cooper Mining Company, Ash Grove Resources, LLC, Marine Coal Sales Company, Hunter Ridge Coal Company, International Coal Group, LLC and Coal Creek Minerals, LLC.

  Once delivered, the coal and limestone are stored in a structure located on a 17 acre pad. Additional coal is stored on the pad without cover. The coal and limestone are crushed on-site and burned continuously resulting in the continuous generation of fly ash,[7] which is collected and moved to storage silos at the Plant. From there it is loaded onto trucks or rail cars and moved off-site. According to the complaint, approximately 80% of the 300,000 tons of fly ash that is generated annually is disposed of in the Class Area.

  Plaintiffs allege the Plant has generated and released fly ash for more than two decades, and assert that it has escaped from transport trucks and rail cars. Flue-gases

---

[6]*The MMHF Facility is about a mile from Bokoshe.*

[7]*The term "fly ash," as alleged in the amended complaint, consists of solid particles produced by the combustion of coal and solid particles of gypsum generated by the injection of crushed limestone into the coal combustion process.*

containing sulfur dioxide, nitrogen oxides, mercury and other matter allegedly have also been emitted. In addition, the Plant is alleged to have released hazardous metal compounds and toxic chemicals into the Class Area, including the MMHF Pit, and to be responsible for the chemicals' disposal into "pits, streams, rivers, groundwater, the air and the general environment within the Class Area." Amended complaint, ¶ 101.

Trucks hauling the fly ash from the plant to dump sites[8] follow a common route (the "Haul Route"), which includes the main roads used by the citizens of LeFlore county when they are traveling between Bokoshe and the Class Area. Plaintiffs claim that

> [a]s a result of the location of the AESSP plant, the Haul Route, and the [fly ash] dump sites, the release of [fly ash] has occurred and is occurring within and across the Class Area. [Fly ash] generated at the [Plant] has been and is being deposited on and in the real and personal property of the Plaintiffs and Putative Class Members. Through contact with polluted air, contaminated water and soil present within the Class Area, the Plaintiffs and Putative Class Members have been and continue to be exposed to [fly ash] generated at the [Plant].

Amended complaint, ¶110.

Most of the fly ash from the Plant has been deposited in the MMHF Pit, formerly a strip mine. Two abandoned underground mines underlie the MMHF Pit, which plaintiffs allege has no liner to contain the contaminants deposited there. Plaintiffs contend that the fly ash, waste fluids and other waste materials, once dumped in the MMHF Pit have migrated, polluting surface and groundwater, evidenced by water samples collected from a

---

[8]*Plaintiffs allege that there were multiple disposal pits, including the Milton Pit, the Rose Mine Pit, the Starlite II Mine Pit and the Heatherly Mine Pit. Amended complaint, ¶¶3(c), 16, 19.*

nearby creek. Winds have allegedly carried fly ash, that was deposited at the MMHF Pit or released during coal combustion or while being loaded, hauled or dumped, into the Class Area.

According to the complaint, MMHF applied for and, on April 16, 2001, received, a permit from the Oklahoma Department of Mines ("ODM") to accept and dispose of Fly Ash from the Shady Point Plant at the MMHF Pit. In July of 2002 an Environmental Protection Agency report stated that significant amounts of fugitive ash were seen when loads of ash were dumped and Oklahoma Department of Environmental Quality ("ODEQ") staff, when visiting MMHF in February 17, 2009, observed large amounts of fugitive ash being emitted into the air when loads of fly ash were being deposited into the MMHF Pit. Plaintiffs claim the Jackson brothers made certain representations and misrepresentations to the ODEQ inspectors during that visit and that ODEQ "came to the regulatory conclusion that fugitive ash is an issue at the MMHF facility." Amended complaint, ¶ 159.

The complaint alleges that, in April 2009, after numerous citizen complaints about "Defendants' conduct in transporting and disposing of Fly Ash," ODEQ performed an air quality full compliance evaluation ("FCE"). *Id.* at ¶ 160. The report stated that MMHF was not operating according to industry standards. Otherwise, "emissions coming from the Disposal Facility would not be considered fugitive in nature . . . ." *Id.* The agency allegedly concluded that MMHF was operating in violation of various provisions of the Oklahoma Administrative Code, including failing to have required permits.

The next month ODEQ inspectors against visited MMHF and made several

observations, including that "[t]he water is generated from oil and gas production and arrives at the facility from various haulers and various sources," and "[t]he ash is generated from [the Shady Point Plant], and "particulate matter was being blown into the air while the ash trucks were unloading and from dry piles of ash that were located all around the area the trucks were driving and unloading." *Id.* at ¶ 162. On May 1, 2009, ODEQ found that MMHF was violating the Oklahoma Administrative Code by failing to submit an emission inventory, to apply for and obtain a construction permit, to file a timely application for an operating permit, to obtain a construction permit and to take reasonable precautions. *Id.* at ¶ 163. Plaintiffs allege that the AES defendants, the MMHF defendants and the fly waste truckers "continue to dispose of their waste in a manner that pollutes and contaminates the environment and community within the Class Area." *Id.* at ¶ 165.

The complaint further alleges that, in September 2002, MMHF sought permission from the Oklahoma Corporation Commission (" OCC") to accept "produced water"[9] from oil and gas wells and that in February 2003 the OCC issued Order No. 472170 allowing "the disposal of water produced in association with oil and gas wells producing coal seam gas" into the MMHF Dump Site. *Id.* at ¶ 170. Plaintiffs allege that the order is a "matter of public record and the [fluid waste] generators and operators were burdened with knowledge of the order and its restrictions." *Id.* at ¶ 171. They claim that the fluid waste deposited at the MMHF Dump Site was not the permitted produced water, but included oil, synthetic-based

_____

[9]*"Produced water" is "the water that exists in subsurface formations and is brought to the surface during oil and gas production." Amended complaint, ¶167.*

7

drilling waste solids and fluids, and frack flowback waste solids and fluids. Plaintiffs assert that "MMHF and the PFW Defendants were at all times aware that the fluids that were being dumped into the MMHF pit were in violation of and in contrary to the provisions of the permit and were not Produced Water." *Id*. at ¶ 172. MMHF sought in May 2004 to amend Order No. 472170 to allow it "to accept 'drilling waste and/or drilling water' from operations produced from 'any geologic zone or common source of supply,'" *id*. at ¶ 173, but dismissed its request the next month.

The complaint alleges that a subsequent OCC Order, No. 491749, issued in June 2004, allowed "MMHF to accept 'fresh water with TDS of 5,0000 mg/l or less' from 'any geologic zone or common source of supply,'" *id*. at ¶ 175, but that MMHF and the PFW Defendants did not abide by the limitation. MMHF was subsequently authorized by OCC Order No. 549096 to "'use [Produced] water with TDS of greater than 5,000 mg/l produced from oil and/or gas wells …[p]rovided any water with TDS of greater than 5,000 mg/l **shall be blended with fresh water** so as to reduce the TDS to 5,000 mg/l or less **prior** to placing such water into the [MMHF] disposal pit.'" *Id*. at ¶ 177 (emphasis in original). Plaintiffs contend MMHF and the PFW Defendants similarly failed to comply with Order No. 549096.

Plaintiffs assert that the PFW Generator Defendants, as well operators, "are recognized by State and Federal law as the 'generator' and 'person responsible' for oil and gas wastes generated at the well site during drilling, completion, and fracking." *Id*. at ¶ 181. They maintain that, as generators of fluid waste, the PFW Defendants "bear full responsibility for proper disposal of the drilling, completion, and frack flowback wastes."

*Id.* at ¶ 183. While OCC rules prohibit the discharge of flowback and hydraulic fracturing fluids to surface waters, plaintiffs claim the PFW Defendants "intentionally sent flowback and other hydraulic fracturing waste fluids from [wells identified in the amended complaint] to the open unlined MMHF Dump Site pit and into surface waters of the Class Area in violation of OCC Rule 165:10-7-24(b)(3)." *Id.* at ¶ 180. As a result, plaintiffs allege, the "toxic and potentially toxic pollutants generated by the PFW Defendants and discharged into the MMHF Dump Site pit, have contaminated and continue to contaminate the air, land, and waters adjacent to, under, and around the MMHF Dump Site and the Class Area." *Id.* at ¶ 182.

Plaintiffs allege that the fluid waste disposed of at "the MMHF Dump Site was mixed with CCW/Fly Ash and the resulting toxic cocktail was allowed to fill the MMHF pit, and regularly overflow the pit into Doe Creek and other creeks, surface drainages, and as sheet flow across private and public lands" and allowed to migrate into "groundwater-bearing horizons." *Id.* at ¶ 187. In October and December 2009, EPA inspectors "'observed unauthorized, non-permitted discharges of pollutants generated from reclamation activities conducted by MMHF which involved mixing fly ash and oil field brine'" and "documented that produced wastewater was being unlawfully discharged from the Disposal Facility to 'waters of the United States.'" *Id.* at ¶ 188. On December 10, 2009, the EPA issued a Cease and Desist Order for violation of the Clean Water Act.

In their first cause of action plaintiffs allege that all defendants, by handling, transporting and disposing of fly ash and fluid waste, engaged in abnormally dangerous

activities which have harmed the persons and property of the plaintiffs and putative class members and the environment of the Class Area. In their remaining causes of action, plaintiffs assert nuisance (private and public), trespass, negligence, negligence per se and unjust enrichment claims against all defendants. Plaintiffs seek compensatory and punitive damages, plus injunctive relief.

The following defendants have moved to dismiss plaintiffs' claims:[10] AES Corporation, AES Shady Point, LLC, Mountain Minerals, LLC, Coal Creek Minerals LLC, MMHF, LLC, Thumbs Up Ranch, LLC, Daryl J. Jackson, Kevin J. Jackson, Kenneth Jackson, Chad Jackson, PX Transportation, Inc. d/b/a Star Bulk, GCI Mining, a/k/a Georges Colliers Inc., McCorkle Truck Line, Inc., Ash Grove Resources, LLC, Farrell-Cooper Mining Company, Brazil Creek Minerals, Inc., Marine Coal Sales Company, Hunter Ridge Coal Company, International Coal Group, LLC, XTO Energy Inc., Highland Oil & Gas, LLC, B & B Gas Well Services, L.L.C., Sedna Energy, Inc., Shields Operating, Inc., Hanna Oil and Gas Company, Hogback Exploration, Inc.,Cholla Petroleum, Inc.,Stephens Production Company, BP America Production Company, Chesapeake Operating Inc., Petrohawk Operating Company, SEECO, Inc., Ross Explorations, Inc., Graco Fishing & Rental Tools, Inc.,Big Mac Tank Trucks, LLC, Bear Productions, Inc., Bear Transports, LLC, Mike Krebbs Construction, Inc., and TXD Transport, LP. BP America Production Company has also filed a motion to strike.

---

[10]*A number of defendants adopted another defendant's or several other defendants' motions.*

Analysis

Strict Liability

Plaintiffs' strict liability and medical monitoring claims will be addressed first, as they can be resolved with minimal consideration of the specific allegations against each defendant group. The court will then address plaintiffs' claims against each defendant group, followed by challenges to plaintiffs' trespass, negligence per se, unjust enrichment, nuisance and class claims.

In their amended complaint plaintiffs allege generally that "Defendants' handling, transport and disposal activities of CCW/Fly Ash and PFW are abnormally dangerous." Amended complaint, ¶ 207. However, in their response brief plaintiffs focus on the actual waste disposal as being the ultrahazardous activity. *See* Doc. #386, p. 12 ("Disposal of Waste is an Abnormally Dangerous Activity"). Plaintiffs assert that, "[a]s a threshold matter, it is uncontested that CCW and PFW were disposed of and have escaped the MMHF Dump Site through the air, surface water and groundwater," *id*. at p. 10, and then proceed to list alleged problems with the disposal site, such as documented escapes of fly ash and fluid wastes from the MMHF Facility by federal and state regulatory authorities. *Id.* at pp. 10-11.

As framed both by the amended complaint, e.g. ¶ 60(d)-(f), 61-72, 74-79, and statements in plaintiffs' brief, Doc. #386, pp. 12-21, plaintiffs' strict liability claims are principally based on allegations that defendants improperly dumped fly ash and oil and gas drilling waste (some not authorized under the Facility's permits) in an open, unlined pit, that

was located too close to a populated area and "dug over subterranean mines."[11]  Doc. #386,

p. 11.[12]  These allegations suffice to state strict liability claims against the MMHF group, but

not the other defendants.[13]

All parties appear to view Oklahoma law as determinative as to these claims.  Under

Oklahoma law, a party engaged in an ultrahazardous activity is liable for damages caused by

the activity regardless of fault.  Wetsel v. Indep. Sch. Dist. I-1, 670 P.2d 986, 990

(Okla.1983).  Oklahoma courts have applied the doctrine of strict liability in cases involving

wild animals and dynamite,  City of Mangum v. Brownlee, 75 P.2d 174, 175-76 (Okla.

1938); Smith v. Yoho, 324 P.2d 531, 533 (Okla. 1958), and the Tenth Circuit has concluded

that Oklahoma courts would apply strict liability to the escape of plutonium.  Silkwood v.

Kerr-McGee Corp., 667 F.2d 908, 921 (10th Cir. 1981), *rev'd on other grounds*, 464 U.S.

238 (1984).  The doctrine also has been applied in a case involving herbicides.  In Young v.

Darter, 363 P.2d 829 (Okla.1961) the Oklahoma Supreme Court concluded that spraying

poison was a hazardous activity and that a landowner whose weed killer drifted and damaged

a neighbor's crop would be accountable for any resulting damage, regardless of fault.  The

---

[11]*Neither coal combustion waste products nor "[d]rilling fluids, produced waters and other wastes from oil and gas operations are regulated as "hazardous wastes" under the Resource Conservation and Recovery Act.  See 40 C.F.R. §§ 261.4(b)(4)-(5).*

[12]*Although plaintiffs discuss defendants' asserted reliance on the "petroleum exclusion," defendants do not rely on it as a defense to plaintiffs' claims.*

[13]*Whether an activity is ultrahazardous is a question of law.  Restatement (Second) of Torts, § 520, comment 1 (1977).  Plaintiffs have not challenged the propriety of defendants' raising the issue in a motion to dismiss. The court concludes that, under the circumstances of this case, the issue can appropriately be addressed at this time.*

court noted that it was presented with a situation in which the doctrine, "'[o]ne must so use his own rights as not to infringe upon the rights of another,' may be applied in its broad and fundamental import." *Id.* at 832.[14]

Young provides a basis for imposing strict liability on the MMHF defendants, but it does not demonstrate the Oklahoma Supreme Court's willingness to extend the doctrine to the extent sought by plaintiffs. Neither do the cases plaintiffs discuss in their brief. In those cases, while the courts imposed strict liability for off-site contamination caused by the discharge or disposal of chemicals and hazardous products, liability was imposed on the property owner, lessee or operator from whose premises the pollution spread. *E.g.*, Daigle v. Shell Oil Co., 972 F.2d 1527, 1531 (10th Cir. 1992) ("Shell used Basin F under lease from the Army to impound hazardous waste generated in its herbicide and pesticide manufacturing activities on the Arsenal"); Town of New Windsor v. Avery Dennison Corp., 2012 WL 677971, at *11 (S.D.N.Y. Mar. 1, 2012) ("It is for the court to decide whether an activity of a landowner is abnormally dangerous and warrants imposition of strict liability.") (emphasis added) (internal quotations omitted); *see also* Fletcher v. Conoco Pipe Line Co., 129 F. Supp. 2d 1255, 1259 (W.D. Mo. 2001) ("The doctrine of strict liability arose from an English case,

---

[14]*While arguably* Young *was based on a nuisance, rather than strict liability, theory, the Oklahoma Supreme Court relied on the rule of* Rylands v. Fletcher, L.R. 3 E. & I. App. (H.L.1868), *which "has been explained and codified in the Restatement (Second) of Torts, section 519 (1977): 'One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.'"* Roeder v. Atl. Richfield Co., *2011 WL 4048515, at *4 (D. Nev. Sept. 8, 2011) (quoting* Valentine v. Pioneer Chlor Alkali Co., *864 P.2d 295, 297 (Nev.1993)). Courts have subsequently cited or referred to* Young *as involving a strict liability claim. See e.g.* Silkwood, *667 F.2d at 921;* Roeder, *2011 WL 4048515 at *4.*

Rylands v. Fletcher, 1 L.R.-Ex. 265 (Ex. Ch. 1866), *aff'd*, 3 L.R.-E & I.App. 330 (H.L.1868). Rylands established the premise that if a person brings something on his land which, if it escapes, is likely to do great damage, that person is prima facie liable for all the harm naturally occurring if there is an escape."). Plaintiffs do not point to a single case that supports doing what they seek to do here – impose strict liability on any party that generated or transported materials to a disposal site from which the materials then escaped. They also fail to make a cogent argument that the Oklahoma courts would expand the scope of the doctrine under the alleged facts. Plaintiffs essentially are asking the court to hold the other defendants strictly liable for the alleged illegal/improper conduct or activity of the MMHF defendants. Their bald assertions that defendants, in addition to the MMHF group, "disposed of" or "caused the disposal of" fly ash or fluid waste, *e.g.* amended complaint, ¶¶ 21, 37, are insufficient to hold them accountable under a theory of strict liability with the parties (the MMHF defendants) that actually disposed of the waste.

Because the only activity plaintiffs claim is ultrahazardous is the disposal of the fly ash and fluid waste, there is no need to analyze the separate activities or operations of the non-MMHF defendants. Nonetheless, using the factors set forth in the Restatement (Second) of Torts § 520 (1977), "the most recognized legal framework for ultrahazardous strict liability claims," Daigle, 972 F.2d at 1544,[15] the court would not find, under the well-pleaded facts, that the other defendants engaged in ultrahazardous activities, even if plaintiffs had

---

[15]*The Oklahoma courts have looked to the Restatement for guidance. E.g.,* Taylor v. Hesser, *991 P.2d 35, 39 (Okla. Civ. App. 1998).*

sought to hold them strictly liable on the basis that their activities were somehow part of the "disposal process."

The Restatement lists six factors to be considered: "( a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." Restatement (Second) of Torts § 520. Of these, only the second and possibly the fourth support a finding that the non-MMF's activities were ultrahazardous. The first, third,[16] fifth factors[17] and sixth factors weigh in

_____

[16]*While no factor is determinative,"[f]or many courts, the analysis of whether an activity is abnormally dangerous revolves around factor (c), whether the activity can be made safe through the exercise of reasonable care."* Fletcher, *129 F.Supp.2d at 1261. Plaintiffs make the conclusory statement that "[a]ll risk of a release and exposure to Defendants' waste cannot be eliminated even had Defendants exercised reasonable care in the handling, transport or disposal of their waste." Amended complaint, ¶204. However, when the amended complaint is read in its entirety it is apparent that, at least with respect to the non-MMHF defendants, plaintiffs are challenging not what defendants do, but how they do it. See* Fletcher,*129 F.Supp.2d at 1261 ("As one court explained, 'if an activity can be performed safely with ordinary care, negligence serves both as an adequate remedy for injury and a sufficient deterrent to carelessness' and the imposition of strict liability is unnecessary.") (quoting* Chaveriat v. Williams Pipe Line Co., *1994 WL 583598, at *5 (N.D.Ill. Oct.18, 1994). They have acknowledged that they are not claiming that the drilling of a well or the operation of a coal plant is an abnormally dangerous activity, Doc. #386, p.13, and have not alleged any basis, factual or legal, for concluding that transporting either fly ash or waste fluids is an ultrahazardous activity per se.*

[17]*Plaintiffs do not challenge the location of the oil and gas wells or assert facts demonstrating that the Plant was improperly located. Their conclusory assertion that, "[a]s a result of the location of the AESSP plant . . . the release of CCW/Fly Ash has occurred and is occurring within and across the Class Area," Doc. #315, ¶ 110, is insufficient to show that the Plant's activity was "inappropriate to the place where it was carried on," seven miles from Bokoshe.*

defendants' favor,[18] resulting in the conclusion that the AES defendants group, the oil producers and the truckers are not engaged in activities warranting the imposition of strict liability.

As plaintiffs' strict liability claims are based on the disposal of fly ash and fluid waste at the MMHF Facility and the court has concluded that Oklahoma law would limit the imposition of strict liability in these circumstances to the group operating/owning the MMHF Facility, plaintiffs' strict liability claims against all but the MMHF defendants will be dismissed with prejudice.

Medical Monitoring

Defendants assert that plaintiffs have failed to allege physical injuries and "Oklahoma law has not recognized medical monitoring as a remedy for plaintiffs without presently identifiable personal injuries." Doc. #353, p. 26. Plaintiffs concede that Oklahoma law does not allow a remedy for medical monitoring in the absence of an existing disease or physical injury. They claim, though, that since they have alleged "they have suffered physical injury from their exposure to Defendants' CCW and PFW," they "are entitled to pursue damages such as the costs of necessary future medical expenses which include monitoring." Doc. #368, pp. 29-30.

---

[18]*The Plant and wells have value in terms of the generation of electrical power, employment, and tax revenues. See generally* <u>Roth v. NorFalco, LLC</u>*, 2010 WL 1754618, at \*9 (M.D.Pa. April 29, 2010) (" For example, an oil well may not be considered abnormally dangerous in Texas or Oklahoma because of the importance the oil industry has to the local economy, whereas the same oil well in Indiana or California might be found abnormally dangerous because it is a lesser industry in those areas."),citing Restatement (Second) Torts § 520, Comment on Clause (f), aff'd,* <u>Roth v. Norfalco LLC</u>*, 651 F.3d 367 (3d Cir. 2011).*

While plaintiffs do allege they have "suffer[ed] physical ailments consistent with disclosures and warnings set forth on MSDS,"[19] amended complaint, ¶199, including "respiratory conditions, such as asthma and bronchial and nasal infections, and skin and eye irritations," *id.,* there are no allegations of physical injury stemming from the oil and gas drilling fluids.[20] Once physical injuries are established, plaintiffs will be allowed to seek necessary future medical expenses, which may include monitoring on an individual basis. Assuming it is proper to challenge a requested remedy in a motion to dismiss, defendants' motions will be granted insofar as plaintiffs seek to establish a medical monitoring fund.

Fly Ash Truckers

The fly ash truckers are alleged to have transported coal to the Plant and/or fly ash from it to the MMHF Facility. The first problem with the claims asserted against this group of defendants is that plaintiffs lump them all together, making no effort to distinguish between the individual trucking companies. They do not explain the particular role any trucking company alleged played in the dispersal of fly ash.

The second problem is that plaintiffs fail to allege facts demonstrating how the fly ash truckers were negligent – what they specifically did that was wrong -- or that provide a basis for them to be sued under any other theory of liability. In the amended complaint plaintiffs

---

[19]Plaintiffs allege that the Plant was required to publish Material Safety Data Sheets ("MSDS"). Amended complaint, ¶129.

[20]Plaintiffs' assertion that "[w]ithin the Class Area, there have been and continue to be significant concentrations of cancer victims," amended complaint, ¶199, is wholly inadequate to demonstrate personal injuries resulting from defendants' alleged conduct.

allege that fly ash is transported to dump sites within the Class Area by trucks which follow a common route through populated areas and, "[a]s a result of the location of the AESSP plant, the Haul Route and the CCW/Fly Ash dump sites, the release of CCW/Fly Ash has occurred and is occurring within and across the Class Area."  Amended complaint, ¶ 110.[21]  This and other similar conclusory statements clearly are insufficient to state a claim of any type against the fly ash truckers.  The only specific facts pleaded linking the trucking companies to the release of fly ash are found in the "MMHF and Regulatory Non-Compliance" section of the amended complaint, where plaintiffs allege that "fugitive dust generated by dump trucks dumping fly ash on the ground" was observed by regulators at the disposal facility.  *Id.* at ¶ 140; *see id.* at ¶162(e) ("Particulate matter was being blown into the air while the ash trucks were unloading . . . .").[22]  However, nowhere is it asserted that the truckers bear responsibility for the ash being blown into the air, instead of, or in addition to, MMHF.  According to the amended complaint, the ODEQ cited MMHF/TUR  for the fugitive fly ash, *e.g. id.* at ¶¶ 140, 142-44, and, a report issued after ODEQ performed an air quality full compliance evaluation of the MMHF Facility in April 2009, quoted in the amended complaint, attributed fault for the fugitive fly ash to MMHF:

---

[21]*There are a few other general allegations attributing the spread of fly ash to the Fly Ash truckers.  See e.g., amended complaint, ¶ 81 (plaintiffs allege that the "CCW/Fly Ash Defendants" have violated state law by allowing fugitive dust to become airborne and pollute the air without taking reasonable precautions to prevent or minimize the pollution); id. at ¶123 ("CCW/Fly Ash released during . . .loading, hauling and dumping is carried into the Class Area by winds . . . .*"),

[22]*There is another general reference in the amended complaint to coal combustion waste "escap[ing] from the transport trucks . . . .," but it is too general and conclusory to support a claim against the fly ash trucking defendants.  Amended Complaint, ¶99.*

> The fly ash unloading operation is not controlled at this time and does not pass through a stack. Other facilities that unload dry, dusty material contain the unloading operation in a building with dust controls. Therefore it is reasonable for the fly ash unloading operation at MMHF to be passed through a stack or other equivalent opening. If this Disposal Facility operated according to the industry standard, emissions coming from the Disposal Facility would not be considered fugitive in nature . . . .

Amended complaint, ¶160.

Elsewhere plaintiffs allege that because the Plant did not have a fly ash disposal facility on-site, the AES defendants had to transport the waste to a disposal facility and had an obligation to protect the public from fugitive fly ash during transport and disposal. *Id.* at ¶¶126-27. However, no similar duty or other basis for liability is asserted against the fly ash truckers. Although plaintiffs argued during the hearing on defendants' initial motions to dismiss, that the trucking companies failed to cover their trucks while moving the fly ash, resulting in it being spewed out as they were moving between the Plant and the MMHF Facility, no allegations to that effect were included in the amended complaint. *See* Doc. #313, p. 70. No facts are pleaded explaining how fly ash allegedly escaped either while it was being loaded on the trucks at the Plant or in transit.

As the court has determined that the fly ash truckers cannot be held strictly liable for the release of fly ash into the air or water, and plaintiffs have failed to allege any facts that demonstrate that this group of defendants, in transporting the fly ash, unlawfully, intentionally or negligently injured plaintiffs, all plaintiffs' claims against the fly ash truckers will be dismissed.

Fluid Waste Truckers

Minimal discussion is needed with respect to plaintiffs' claims against the fluid waste truckers. The court has rejected the assertion that the fluid waste truckers can be held strictly liable for merely transporting the oil and gas production waste fluids to the MMHF Facility,[23] and there are no facts pleaded in the amended complaint upon which they could be held liable to plaintiffs for any other claim that is asserted. All plaintiffs' claims against the fluid waste truckers will be dismissed.

Oil Producers Defendants

Plaintiffs have pleaded that the Oklahoma Corporation Commission issued a permit to the MMHF Facility that allowed it to accept "produced water" with specified limitations from oil and gas wells. They allege each oil producer defendant sent unauthorized waste fluids from its wells to the Facility for disposal, which have contaminated surface and groundwater in the Class Area. They seek to recover for "personal injuries, property damages and harm to their community and environment," amended complaint, ¶59, and claim that defendants have polluted the surface waters of "Doe Creek, Buck Creek, and the Poteau River, as well as Class Area ponds, lakes, and other surface water impoundments owned or used by the Plaintiffs and Putative Class Members," and "caused contaminants to be released into . . . underground drinking water sources." *Id*. at ¶74, 65.

The oil producers initially argue that plaintiffs' assertion that they generated waste

---

[23]*Although there were restrictions as to the fluids it could accept, the MMHF Facility was authorized by the Oklahoma Corporation Commission to accept "Produced Water." Amended complaint, ¶¶ 168, 170, 175, 177.*

fluids is not enough to state a claim against them.  The court would agree if that was all plaintiffs alleged.  However, they also have pleaded that each oil producer defendant sent drilling waste to a disposal facility that was not authorized to receive at least some of the fluids. Plaintiffs have alleged sufficient facts to demonstrate, for purposes of the motions to dismiss, that the oil producers had a duty to insure that the waste generated by their oil and gas wells was disposed of properly and breached that obligation.

The oil producers next contend plaintiffs have failed "to allege a nexus between any fluid allegedly generated from an XTO facility and harm to any Plaintiff."  Doc. #350, p. 13. Plaintiffs have, albeit barely, sufficiently met this requirement, also.  At this time they only have to allege a connection, not prove it.

What plaintiffs have not done, though, is make specific allegations of harm to their persons or property.  As XTO Energy Inc. ("XTO")  asserts, plaintiffs allege no facts showing "exactly what harms they allegedly suffered" or how the alleged contamination "affected the individual Plaintiff's specific property."  Doc. #350, pp. 15,16.  XTO recognizes that plaintiffs have alleged that "2009 EPA inspections allegedly documented that produced wastewater was discharged from the MMHF Site to 'waters of the United States,' and that the total soluble salts exceeded drinking water standards."[24]  *Id.* at p. 16.  However, they contend, and the court agrees, that  plaintiffs have "not allege[d] facts to support that

_____

[24]*Plaintiffs allege that in 2009 "[t]esting of the water [by the EPA]  demonstrated that the water was polluted and toxic . . . .," yet they fail to specify what water was tested and whether any testing has been done since then.  Amended complaint, ¶189.*

'waters of the United States' are on their land or that their drinking water is contaminated." *Id.* General assertions of plaintiffs' "reasonabl[e] concerns" are not enough. *See* Amended complaint, ¶¶194-96. As XTO correctly notes, plaintiffs have not pleaded facts that "show that any individually named Plaintiff has come into contact with any [contaminated fluids] . . . that has caused him or her to suffer any specific injury." Doc. #350. p. 18. They also have not alleged any loss in property values or other property damage resulting from the fluid waste.

As with much of the amended complaint, plaintiffs make generalized, conclusory assertions of their claimed injuries. While, based on the allegations made, it is not improbable that the named plaintiffs individually sustained personal injuries or property damage as the result of the allegedly contaminated water, *see e.g.,* amended complaint, ¶¶ 120-21, plaintiffs have not pleaded sufficient facts demonstrating those losses to make it past a Rule 12(b)(6) motion.[25] This deficiency in the amended complaint precludes plaintiffs from stating any claim against the oil producer defendants. Plaintiffs will be granted leave to file within fifteen days a supplement to their amended complaint that cures this pleading gap, if they can do so. The court will then determine whether plaintiffs have sufficiently pleaded that they personally sustained injuries as the result of the oil producers' alleged conduct or whether further briefing is needed to assist in making that determination.

_____

[25]*In their briefs some defendants have discussed allegations in the amended complaint which they believe may be an attempt to state a conspiracy claim. Plaintiffs have not pleaded a conspiracy claim. The court also does not have to address, at this time, plaintiffs' assertion in their response that defendants are jointly and severally liable for any damages sustained. The joint and several doctrine apportions, rather than creates, liability.*

AES Defendants

The AES defendants contend plaintiffs' claims against them fail because their release of coal combustion products at the Plant is pursuant to permits issued by the ODEQ and plaintiffs have not alleged that those releases caused them any injury. They also assert plaintiffs have failed to allege any factual basis for holding them liable for releases that allegedly occurred when the fly ash was in transit or after it arrived at the MMHF Facility.

Having disregarded the generalizations and extraneous material in the amended complaint, the court concludes plaintiffs have sufficiently alleged, again barely, all but the injury or damage element of the claims they assert against the AES defendants based on the operation of the Plant. *See e.g.,* ¶¶ 99-100. However, plaintiffs have not pleaded a factual basis for holding the AES defendants responsible for any injuries resulting from the transportation of the fly ash to, or its disposal at, the MMHF Facility. As was discussed earlier in conjunction with plaintiffs' claims against the fly ash truckers, no facts are pleaded regarding any alleged releases when the coal combustion waste was in transit. Plaintiffs also have not alleged the AES defendants were aware of problems with the Facility, that unauthorized coal combustion waste was sent there from the Plant or any other facts that would support a claim against the AES defendants for something that happened after the coal combustion waste arrived at the MMHF Facility.[26]

_____

[26]*Plaintiffs' general, conclusory assertions to the effect that "Defendants, including their agents and/or employees, knew or in the exercise of reasonable care should have known, that their operations, actions and omissions would result and were resulting in the release, escape and migration of toxic, hazardous, harmful and deleterious substances," amended complaint, ¶221, are insufficient to demonstrate that the AES defendants were aware of any improper or illegal conduct*

Plaintiffs' allegations regarding damages resulting from the fly ash also are insufficient. They are granted fifteen days to supplement their amended complaint with allegations that plead facts identifying specific injuries or property damage suffered by specific plaintiffs. The court will then determine whether plaintiffs have met their pleading burden or whether further briefing is needed to assist in making that determination.

The AES defendants also contend that plaintiffs' requests for injunctive relief are preempted. However, because the preemption argument does not extend to plaintiffs' claims, but rather the relief that is sought, it is premature. The AES defendants may reassert the defense subsequently, if appropriate.

MMHF Defendants

With the exception of their failure to plead injury adequately, plaintiffs have satisfied their pleading burden against the MMHF defendants. Plaintiffs will have fifteen days to correct that pleading deficiency.

Specific challenges made by various defendants to some of plaintiffs' claims follow.

Trespass

Defendants Chesapeake Operating, Inc., Petrohawk Operating Co., Seeco, Inc. and Ross Explorations, Inc. (the "Chesapeake defendants") argue that plaintiffs' trespass claims fail because they have not pleaded facts demonstrating "that the defendant possessed trespassory intent." Doc. #365, p. 29. The defendants contend that "[w]hile a defendant

_____

*of the MMHF defendants.*

need not have intended to commit trespass, it must at least have intended to enter (or cause the entry) onto the plaintiff's property." *Id*. at p. 29. They cite no Oklahoma authority and the law appears to be to the contrary, as the intent required is "an intent to do the act that results in the trespass." Craig v. City of Hobart, 2010 WL 680857, at *3 (W.D. Okla. Feb. 24, 2010). Plaintiffs essentially claim that the producer defendants intended to have unauthorized waste fluids taken to, and disposed of at, the MMHF Facility. That is sufficient to allege a trespassory intent. Plaintiffs' trespass claims will not be dismissed for the reasons urged by the Chesapeake defendants.

Negligence per se

Defendants assert that plaintiffs' negligence per se claims fail because the environmental statutes and regulations relied upon were intended to protect the public welfare, not support private actions for personal injury. Plaintiffs fail to address this argument and thereby confess defendants' motions as to this issue. *See* LcvR.7.1(c). Plaintiffs' negligence per se claims will be dismissed with prejudice.

Unjust enrichment

Defendants argue that plaintiffs' unjust enrichment is barred because they have an adequate remedy at law. While plaintiffs are not entitled to a double recovery for the same injuries, they are entitled to pursue their unjust enrichment claims as alternative claims. Burlington N. & Santa Fe Ry. Co. v. Grant, 505 F.3d 1013, 1030 (10th Cir. 2007); *see* Krug v. Helmerich & Payne, Inc., 2013 OK 104, ___ P.3d ___, ___ (2013) ("The long-standing rule in Oklahoma is that a plaintiff may not pursue an equitable remedy when the plaintiff

has an adequate remedy at law."). Contrary to the argument made by some of the oil producer defendants, the court concludes plaintiffs have sufficiently pleaded that the producer defendants sustained a pecuniary benefit as the result of their alleged improper disposal of the drilling waste fluids – defendants were "save[d] the expense of properly disposing of the hazardous and solid waste." Amended complaint, ¶236.

Nuisance

Some of the oil producer defendants argue that they cannot be held liable for nuisance because they lacked control over the "alleged nuisance-causing instrumentality" – the MMHF pit. Doc. #353, p. 26. However, defendants have not demonstrated that, under Oklahoma law, plaintiffs cannot recover from the oil producers for nuisance. Defendants rely principally on two distinguishable cases from New Jersey and Rhode Island and do not adequately address the question of whether they could be held liable for having "contributed" to the nuisance. *See* Restatement (Second) of Torts § 840E. Defendants' request to dismiss plaintiffs' nuisance claims will be denied.

Class Claims

One of the oil producer defendants challenges the class claims. Assuming plaintiffs' supplement to their amended complaint includes allegations of particular injuries to particular plaintiffs from the fluid waste, then the class claims will be sufficiently pleaded to withstand dismissal at this time. However, class certification of any claims will occur only if the court is satisfied, after a "rigorous analysis," that the requirements of Rule 23(a) have been met. Gen. Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 161 (1982).

Motion to Strike

Defendant BP America Production Company ("BP") requests an order striking references in the amended complaint to the Resource Conservation and Recovery Act and related federal regulations. The motion will be denied as the court does not find that "the challenged allegations have no possible relation or logical connection to the subject matter of the controversy [or] may cause some form of significant prejudice to one or more of the parties to the action." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382, at 436-41 (3d ed. 2004).[27]

Conclusion

While the court recognizes the seriousness of plaintiffs' allegations, it cannot ignore their failure to plead sufficient facts to support many of their claims. The court referenced specific problems with the complaint at the hearing on the last set of motions to dismiss, yet plaintiffs have done little to correct the obvious deficiencies. Therefore, while plaintiffs will be allowed to supplement their amended complaint as directed, no further amendments will otherwise be permitted. Further delays to allow plaintiffs yet another opportunity to satisfy the federal pleading standard are not warranted. This case was filed over two years ago and

---

[27]*Despite their allegations in the amended complaint of defendants' violations of numerous federal and state environmental statutes and regulations, plaintiffs have stated in their amended complaint that they "do not seek recovery pursuant to Federal or State administrative and regulatory enactments." Amended complaint, ¶58. Some defendants express concern that plaintiffs, having failed to comply with the notice requirement of the Resource Conservation and Recovery Act ("RCRA",) are nonetheless attempting to "bring RCRA claims quietly through the back door cloaked as state common-law negligence claims." Doc. #353, p. 20. This they will not be allowed to do.*

the complaint has been amended twice.

Accordingly, plaintiffs' strict liability claims against all but the MMHF defendants are dismissed with prejudice. Plaintiffs' claims against the trucking companies – both the coal/coal combustion waste and oil and gas drilling fluid waste – are dismissed. Plaintiffs' negligence per se claims also are dismissed with prejudice. BP America Production Company's motion to strike is denied.

A decision as to whether plaintiffs' claims against the remaining defendants ( the AES defendants, the MMHF defendants and the oil producers) should be dismissed will be made after review of plaintiffs' supplement to their amended complaint.

**IT IS SO ORDERED**.

Dated this 8th day of January, 2014.

JOE HEATON
UNITED STATES DISTRICT JUDGE